**People of the State of Illinois, Plaintiff-Appellee, v. Vernon J. Knox, Defendant-Appellant.**

**Gen. No. 50,630.**

First District, Fourth Division.
December 15, 1967.

Adamowski, Newey & Riley, of Chicago (Francis X. Riley, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane, Chief of Criminal Appeals, and Ronald Butler, Assistant State's Attorney, of counsel), for appellee.

MR. JUSTICE McCORMICK delivered the opinion of the court.

The defendant, Vernon J. Knox, was tried before a judge and jury in the Criminal Court of Cook County. The jury returned a verdict finding him guilty of larceny, upon which verdict the court entered judgment and sentenced Knox to the penitentiary for a term of two to five years. From that judgment this appeal is taken.

On June 6, 1962, Knox had been indicted by the Grand Jury of Cook County, together with Robert W. Pfeiffer. The indictment had 11 counts, in all of which Pfeiffer was indicted as principal and Knox either as principal or as aiding and abetting Pfeiffer in charges of embezzlement, larceny by bailee, larceny, and obtaining money by use of the confidence game.

In this court the defendant alleges that he was tried and convicted of a crime for which he was not indicted; that his conviction resulted from the State's use of other alleged crimes in the proof that he had committed this one; that the State introduced too much evidence, much of which was irrelevant; that the closing argument of

the prosecutor was improper; and that the court failed to hold a hearing after a challenge to the involuntary character of the two statements of defendant.

The evidence is that Knox was a lawyer, also a licensed real estate broker, and secretary of his family-owned corporation, Random Realty Company. Hillside Savings and Loan Association, a state-chartered association, was located in Hillside Shopping Center, Hillside, Illinois. It was organized in April 1957, and on April 30, 1963, merged with a Federal savings and loan association. Pfeiffer was its president and managing officer from the time of its organization in 1957 to May 1959, and from May 1959 until November 1960, he was chairman of the board. He was also a member of the board's loan committee.

During 1959 and 1960 the defendant, Knox, had over 100 mortgage transactions with Hillside Savings and Loan. On June 9, 1959, among the applications for loans pending with Hillside was one of a vacant lot in Crystal Lake, which was submitted by Knox. As a part of the transaction he executed a note secured by a mortgage in the sum of $20,500, and as a part of the transaction for the approved loan Hillside issued a check for $19,250; the difference is reflected in charges for making the loan. The $19,250 was deposited in Knox's account on June 12, 1959. This loan will be referred to as Loan No. 1 (File No. 60290). At about the same time Knox gave Pfeiffer his own check for $20,000.

It is claimed that the property in question then had a market value of $3,000. Another loan, which will be referred to as Loan No. 2 (File No. 60369), was made by Knox on February 20, 1960, about eight months after the transaction for which he was indicted and tried.

Two statements were made by Knox before the trial; one to the Attorney General concerning Loan No. 1, wherein Knox said he went to the Attorney General's office of his own free will and volunteered to make the

152

statement; that the beneficial interest in trust covering the property was in the Random Realty and Finance Corporation, and that he had authority of direction under that trust agreement; that he had signed the application for a loan on the property in question in the amount of $21,500 for new construction; that the value of the lot was $3,000 or $4,000; that Pfeiffer accepted the application and gave the money in a lump sum without following customary procedures; that is, he released the money without asking for waivers or a contractor's statement; that Knox felt that Pfeiffer knew he was loaning a lump sum of money on a vacant piece of property because the application showed that it was for new construction. Knox further stated that he could not explain how a picture of a home on the property in question was attached to the appraisal report of Frank Starek, who had been employed by Knox.

Knox stated that when the money for Loan No. 1 was given to him he turned it over to Pfeiffer; that he planned to build a new home on the lot when Pfeiffer returned the money to Hillside and released the mortgage. Knox also stated that there was an understanding between himself and Pfeiffer that part of the money Knox received as a loan on the property was to be given to Pfeiffer as a loan. Knox stated that he received the check for $19,250 and cashed it; he endorsed it and put it either in his business account or the Random Realty account, but did not keep the money; that on the same day he issued a check to Pfeiffer for $20,000 as a loan. He stated that this check was written out of the Vernon J. Knox Trust Account in the Home State Bank of Crystal Lake; that there was an agreement between him and Pfeiffer that Pfeiffer would make the payments on the mortgage; that he was certain Pfeiffer was making the payments because he had agreed to do so; that Pfeiffer told him he was unable to make payments after June 23, 1961, but that he would pay them and bring them up to

date. Knox further stated that on March 29, 1960, the loan ledger on Loan No. 1 indicated an indebtedness in the sum of $20,456.44, and he could not explain how the entire amount of this mortgage was released as evidenced by a document signed by Pfeiffer and Anthony Montalbano, secretary and assistant treasurer of Hillside. Random Realty was indebted to John Laures, and after the release had been secured on the property in question the lot was conveyed to Laures as a part payment of the obligation.

Knox also made a statement to the State's Attorney with reference to Loan No. 1, in which he said that the statement was given voluntarily and without any promise or threat of any kind; that the documents concerning the loan were acknowledged by Knox to be true and correct and bore his signature, and that he had submitted them to Pfeiffer; that Pfeiffer had asked Knox for a loan of $20,000; that the loan which Knox applied for from Hillside was to enable him to make the loan to Pfeiffer; that Knox received $19,250 on the loan he applied for, and that Pfeiffer was the only person at Hillside who handled and processed that particular loan. Knox stated that on the same day he drew a check to the order of Pfeiffer in the amount of $20,000 from a trust account controlled by him; that Knox deposited the check for $19,250 in the trust account at the Home State Bank in Crystal Lake for the purpose of covering substantially the check for $20,000 issued to Pfeiffer; that Knox and Pfeiffer had a conversation in which Pfeiffer stated he would make the payments at Hillside on the particular loan because Pfeiffer was to receive the benefits of the loan; that Knox presented no mechanics' lien waivers with respect to any proposed construction or improvements to be made on that property; that Pfeiffer took care of the insurance and that Knox had never made any payments on that loan; that prior to the release of the mortgage he had a

conversation with Pfeiffer to the effect that it was desirable to release the mortgage in order to improve the particular property. Knox stated that prior to the release of the mortgage he had a conversation with Pfeiffer to the effect that by releasing the mortgage on that particular lot there would be less risk of anyone discovering anything improper with respect to the loan made in June 1959 on account of a too low tax bill or of any physical inspection of the property and finding that it was vacant instead of improved; that at the time in March 1960 that the release was secured and recorded, the loan secured by the mortgage which was the subject of that release, was still outstanding and for the most part in principal amount unpaid; that Pfeiffer kept the payment book covering the loan of June 9, 1959, for the purpose of making the loan payments. Knox stated that he had secured the loan with the knowledge that the particular lot on which the loan was made was not in fact improved, and that the release of the mortgage securing the loan was made with Knox's knowledge that the loan secured by the mortgage had not in fact been paid, and that when the lot was conveyed to Laures, Knox knew that the loan was not paid off and that Pfeiffer had no authority to release that particular mortgage at that time.

Knox also made a statement to State's Attorney Bowles with reference to Loan No. 2. Again Knox stated therein that it was given voluntarily and without any promises or threats of any kind; that the application for the loan on Lot 61 in Edgebrook Heights Addition in McHenry was true and correct and bore his signature; that he had secured the appraisal of John W. Fink, Jr., and had submitted it in connection with the application for the loan; that the check of Hillside Savings & Loan Association CN–4245, dated February 20, 1960, in the sum of $23,848.57, payable to the order of Vernon J. Knox, represented the proceeds of Loan No. 2; that the property

155

which was the subject of the loan was not in fact improved but vacant at the time the loan was made; that the application for the loan was made out to show the age of a house allegedly on the lot as one year for the purpose of concealing from Hillside the fact that the property was not improved. Knox stated that the appraisal report also was presented in such form as to be at least somewhat ambiguous and not to show the fact that the property was not improved; that the release of the mortgage was secured by Knox and recorded by him in May 1960; that at the time that particular release was secured and recorded, Loan No. 2, secured by the mortgage which is the subject of the release, was still outstanding and in the most part unpaid; that Knox knew this at the time the release was secured; that Knox secured the release to conceal from Hillside the fact that such release was being secured with respect to a mortgage securing a loan which at that time was unpaid.

These statements were admitted in the trial of the case by the court, over the objection of Knox, a matter which we will take up more fully later on in this opinion. Knox testified in the trial that he had first met Pfeiffer in December 1958, when Pfeiffer was president and general manager of Hillside; that Pfeiffer told him he would be glad to consider any applications he would care to make for loans. He stated that on June 9, 1959, Pfeiffer told Knox about the possibility of Knox's making him a loan; that Pfeiffer said he would have to have $20,000 soon and would pay it back in 30 or 60 days. Knox said he made out a check for $20,000 and gave it to Pfeiffer on June 9, 1959, at which time Knox had a balance in the Cary State Bank of $35,000 or $40,000. After that he talked to Pfeiffer many times about the loan, and on August 20, 1959, he told Pfeiffer he would have to give him a note or he would sue him for it; that payments were coming due on Loan No. 1, and Knox had to start building a house, and would like to have Pfeiffer assume

the loan from Hillside, which Pfeiffer agreed to do. Pfeiffer also agreed to make monthly payments of $136 on the note to Hillside, and said if he did that he would have to sign an assumption agreement, which he did.

In March 1960, Knox told Pfeiffer he would like him to pay off the loan since he had a buyer for the lot. He stated that he received the release of the mortgage in the mail about the first of March; that he recorded the release, then sold the lot to Laures around the first of April; that in March 1961 he talked to the bookkeeper at Hillside regarding the mortgage, and she told him the loan had not been paid off; that he told her he had understood it had been paid off a year before. On rebuttal this testimony was contradicted by the Hillside bookkeeper. Knox stated that he talked to Pfeiffer on April 30, 1961, at which time he asked Pfeiffer about paying off the loan and Pfeiffer said he would do it very soon; that in March 1962 he again talked to Pfeiffer and told him he had not lived up to his agreement to assume the loan and pay it off. Knox identified the appraisal of Starek.

Questioned about the statement he gave to the Attorney General, Knox said those statements were given on the advice of his attorney, but that he did not tell the truth in the statements, although they were fundamentally correct; that when he received the release of the mortgage in March 1960 he believed that Pfeiffer had paid off the loan and that it was his belief until May 1961; that it was still his belief at the time he conveyed the property to Laures; that when he told the State's Attorney he knew the loan had not been paid off it was because the State's Attorney told him he should answer "yes" to all his questions as his statement would be used for the purpose of convicting Pfeiffer.

Knox denied having any conversations with Pfeiffer to the effect that he considered it desirable to secure a release so as to avoid or lessen the risk of having anyone

discover anything improper about the transaction in which the mortgage was given. He stated that he did not believe that Pfeiffer knew the lot involved in Loan No. 1 was vacant on June 9, 1959, when Knox got the check for $19,250; and that his statement to the representative of the Attorney General to the contrary was not true. He stated that he had no understanding with Pfeiffer that he would loan Pfeiffer any amount of money before Loan No. 1 was made, and that the answers given in his statement to that effect were false.

Knox further stated that in August 1959 Pfeiffer first agreed with him to make payments on Loan No. 1, and that if he had ever made a statement to the contrary it was wrong; that the statement he made to the Attorney General was false with respect to the time at which Pfeiffer had agreed to make the payments, and that the statement he made to the State's Attorney was not true that he and Pfeiffer had on June 9, 1950, discussed making the loan. He stated he was aware that it was the custom at the Crystal Lake Savings and Loan, regarding loans for construction purposes, to release the Association's money only on liens and waivers presented by the various contractors as construction progressed, although he did not know what the custom was generally. He stated that until about June 1959 he was the secretary of Crystal Lake Association; that he did not think there was anything improper or illegal in his dealings with Hillside with regard to Loan No. 1. He stated that he received the bulk of the proceeds of the loan on June 9, 1959, and that he did not use the $19,250 for construction purposes; that he deposited the check in the Home State Bank at Crystal Lake and drew and delivered to Pfeiffer the check for $20,000 introduced in evidence; that the statement he made to the Attorney General that the money which was given to him was turned over to Pfeiffer, is wrong.

An insurance policy, a State exhibit, on the lot in question was shown to the witness. In the policy the description of the property is "frame, approved roof, one family dwelling." Knox testified that there was no such house on that location nor was there ever a house during the time the policy was in effect. He stated that the picture attached to an exhibit introduced by the State was really a picture of the house built on the lot next door. He also testified that his statement in the exhibit submitted by the State with reference to his conversation with the State's Attorney to the effect that the present statement was given by him freely and voluntarily without any promises or threats of any kind, was false; that his statement in the State's exhibit that the showing of the age of the house as one year was for the purpose of concealing from Hillside the fact that the property in question was not improved, was false; that the application was mistakenly made to show the age of the house as about one year; that he could not explain how the statement came to be made and that he had signed the application but did not read it before signing it.

With reference to Loan No. 2 Knox testified that about April 17, 1962, he made a statement to the chief investigator for the Attorney General that in the application for a loan of $25,000 it was represented that there was a one-year old brick and stone house on the lot. He testified that there was no house and that the statement was false; he said it was his plan to build a house on the lot but it was never built. He testified that his statement that such representation was made in order to deceitfully secure a loan from Hillside was false.

Knox testified that the statement made to the Attorney General that he intended to mislead Hillside by the appraisal was false; that many other of the statements made by him in the State's exhibit were false. He stated that on May 13 his attorney introduced him to State's

Attorney Bowles; that in the presence of Bowles his attorney told him that Bowles was after Pfeiffer and wanted to use Knox against Pfeiffer; that Bowles said they were interested in getting all the information they could on Pfeiffer; that unaccompanied by his attorney, Knox went with Bowles to his office and made the statement in question.

Knox's first attorney testified that he had a conversation with Knox but that Bowles was not present; that in that conversation he said nothing about Knox being a witness against Pfeiffer, nor did he tell Knox he would not be prosecuted by Bowles. The attorney further testified that he had never had a conversation with Bowles.

■ It is apparent from a careful reading of the record that if all the evidence in the record was properly before the jury the State had proved the defendant guilty beyond a reasonable doubt. In this court the defendant contends that the State improperly introduced in evidence other alleged crimes and that the defendant consequently was tried and convicted of a crime for which he was not indicted. The objections are centered upon the introduction of evidence of Loan No. 2, whereas he was indicted only for Loan No. 1. The well-settled rule in Illinois is that evidence of other crimes than those charged in the indictment is competent when it tends to establish a common criminal scheme, plan, system, design or course of conduct. People v. Davis, 412 Ill 391, 107 NE2d 607; People v. Rooney, 355 Ill 613, 190 NE 85.

■ In the instant case the defendant objects particularly on the ground that the second loan occurred subsequent to the transactions growing out of the first loan for which he was indicted. In People v. Lehman, 5 Ill2d 337, 125 NE2d 506, the court said at 343:

"Defendant suggests that a distinction is to be drawn between prior and subsequent offenses. There are decisions making that distinction where the

160

question at issue is one of knowledge or intent. (See People v. Gotler, 311 Ill 387; People v. Hobbs, 297 Ill 399.) But here the question is whether the defendant's conduct evidenced a peculiar plan to commit a particular offense, and we see no reason to exclude conduct occurring subsequently. (Cf. People v. Botulinski, 392 Ill 212; Perry v. People, 116 Colo 440, 181 Pac2d 439; II Wigmore, Evidence, secs 304, 316.)"

In the case before us the evidence as to the second loan was introduced to show a particular plan to commit an offense and it was properly admitted. We find no merit in defendant's contention that the State overtried the case and introduced evidence which was irrelevant.

■ ■ The defendant also argues that the verdict of the jury which found the defendant guilty of larceny in the manner and form charged in the indictment which also contained the statement "and we further find from the evidence the value of the property so stolen to be $43,098.57," should be reversed because the indictment and the verdict are contradictory. However, it is the rule that "That portion of a verdict which lies beyond the legitimate province of the jury may be treated as surplusage and disregarded, where to do so will still leave a complete and valid verdict." 15 ILP, Criminal Law, § 775. In 23A CJS, Criminal Law, § 1397, it is said: "A general verdict, which is responsive to the issues, will not be reversed solely because it finds facts not embraced in the issues; such findings may be rejected as irresponsive and therefore surplusage."

■ In People v. Schrader, 2 Ill2d 212, 117 NE2d 786, at 216, it is said: "The test of the sufficiency of a verdict is whether the jury's intention can be ascertained with reasonable certainty from the language used." Also see Morella v. Melrose Park Cab Co., 65 Ill App2d 175, 212

NE2d 106; People v. Orlando, 380 Ill 107, 43 NE2d 677; and People v. Williams, 334 Ill 241, 165 NE 693.

In the present case the amount of $43,098.57 may be rejected as surplusage. The verdict is sufficient.

██ ██ It is also argued that the court erred in denying defendant's motion for a mistrial after the Assistant State's Attorney had testified in rebuttal as a witness for the State. The defendant and the State both rely on People v. Crump, 5 Ill2d 251, 125 NE2d 615. Under the facts in that case we do not think it is applicable. The court is vested with discretion in permitting a witness to testify, even if an order excluding witnesses has been entered. People v. O'Malley, 404 Ill 165, 88 NE2d 454. In the case before us the State's Attorney was properly permitted to testify in rebuttal as a witness for the State. People v. Schraeberg, 347 Ill 392, 179 NE 829; People v. Gerold, 265 Ill 448, 480, 107 NE 165. 97 CJS, Witnesses, § 113 states: "A prosecuting attorney is competent to testify, in the discretion of the court, even though the practice is not approved except where necessary."

Defendant also objects to statements made in the argument of the Assistant State's Attorney. It might be stated as an axiom that there is no perfect trial, nor is there any perfect argument to the jury either on the part of the State or on the part of the defendant. In People v. Clark, 9 Ill2d 46, 137 NE2d 54, the court said at page 50:

"The next contention of defendant is that the closing remarks of the assistant State's Attorney were so prejudicial and inflammatory as to warrant a reversal of his conviction. Although defendant's brief and argument contains what purports to be an excerpt of the prosecutor's summation to the jury, the abstract, by which this court must be guided in its consideration of the errors assigned, does not in-

162

clude either the argument complained of or a showing that any objection was made and a ruling of the court obtained thereon. While we remark in passing that the language of the excerpt does not appear to exceed the bounds of legitimate argument, it is sufficient answer to this claim of defendant to point out that the failure of the party raising such issue to include the argument in the abstract of record, together with a showing of objections and rulings thereon, precludes this court from considering the issue on review. People v. Ritcheson, 396 Ill 146; People v. McDonald, 365 Ill 233; People v. Smith, 404 Ill 125."

In the case before us the abstract does contain certain excerpts from the argument of counsel; however, much of the matter to which the defendant in his brief raises objections is not contained in the excerpts. In any case, we do not believe that the prosecutor injected prejudicial error into the trial by his closing argument.

■ In People v. Stahl, 26 Ill2d 403, 186 NE2d 349, the court, while finding that in its opinion the prosecutor in his argument went further than was proper, nevertheless affirmed the judgment in the trial court, saying at page 406:

"Moreover, reversal is not warranted unless it appears that the improper remarks complained of influenced the jury in a manner that resulted in substantial prejudice to the accused. (People v. Swets, 24 Ill2d 418; People v. Berry, 18 Ill2d 453; People v. Sleezer, 9 Ill2d 57.) Here there was overwhelming proof of guilt, indeed the sufficiency of the evidence is not challenged, and the jury returned the only verdict that could reasonably be returned."

In the instant case the argument made by the prosecutor did not constitute reversible error.

163

The jury returned a verdict finding the defendant guilty of larceny. The court properly ordered that judgment be entered in accordance with the verdict. However, the judgment as it appears in the record is that the defendant was guilty of obtaining money and goods by means of the confidence game. We do not find any point made on this in defendant's brief in this court, even though the court before the case went to the jury, had nolle prossed the confidence game count.

■ ■ The defendant also argues that the trial court erred in failing to make a prior determination of the involuntary character of defendant's statements to the Attorney General and the State's Attorney. The defendant argues that the statements were confessions. The State responds by saying that the statements were not confessions but were admissions, and that consequently it was not necessary for the court to pass upon whether they were or were not voluntary. The State makes the further argument that the defendant had failed to make the motion to suppress prior to the trial of the case; that the motion was not made in writing, and consequently was a violation of section 114–11 of the Code of Criminal Procedure (Ill Rev Stats 1963, c 38, § 114–11). However, in People v. Strader, 38 Ill2d 93, 230 NE2d 569, the Supreme Court followed the rule laid down in Jackson v. Denno, 378 US 368, 12 L Ed2d 908, that a defendant is denied due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, and even if there is ample evidence aside from the confession to support a conviction; that the defendant has the constitutional right at some stage in the proceedings to object to the use of the confession and to have a determination upon the issue of voluntariness.

■ In People v. Lefler, 38 Ill2d 216, 230 NE2d 827, the Supreme Court held that while the statements objected to were not in the true sense of the word con-

fessions, nevertheless they were inculpatory. The court disregarded some previous decisions (People v. Speice, 23 Ill2d 40, 177 NE2d 233, and People v. Stanton, 16 Ill2d 459, 158 NE2d 47), and pointed out that in People v. Hiller, 2 Ill2d 323, 118 NE2d 11 the court held that there should be no distinction between an incriminating statement and a confession, and that an incriminating admission should not be admitted in evidence over objection without a preliminary hearing to determine whether it was voluntary; that the voluntary character of an out-of-court statement must first be established before the statement can be used, even for impeachment purposes. The court cited People v. Newman, 30 Ill2d 419, 197 NE2d 12; People v. Tate, 30 Ill2d 400, 197 NE2d 26; and Miranda v. State of Arizona, 384 US 436, 16 L Ed2d 694, 86 S Ct 1602.

In People v. Costa, 38 Ill2d 178, 230 NE2d 871, just before the trial of the case the defendant made an oral motion asking the court to determine whether certain statements made by him could be admitted in evidence, and the court denied the motion, saying, at page 181:

> "It is difficult to determine from the record the precise ground upon which the hearing was denied. The ruling may have been based in part on the assumption that a preliminary hearing is required only when the objection to admissibility is that the statement was 'involuntary' in the sense that it was the product of coercion or improper inducement. The defendant's attorney apparently so understood the ruling. But the principle that underlies Jackson v. Denno, (1964) 378 US 368, 12 L Ed2d 908, also requires a preliminary hearing when the objection is based upon the standards of admissibility prescribed by Escobedo v. Illinois, (1964) 378 US 478, 12 L Ed2d 977, Massiah v. United States, (1964) 377

US 201, 12 L Ed2d 246, and more recently Miranda v. Arizona, (1966) 384 US 436, 16 L Ed2d 694. These standards go beyond what has been considered 'involuntary in traditional terms.' 384 US at 457, 16 L Ed2d at 713."

The court in Costa further held that the trial court may have denied the preliminary hearing because no written motion was presented; that "If the ruling rested upon this ground, we are of the opinion that a short continuance should have been granted so that a written motion could be prepared. Whatever the reasons that prompted the ruling, its result is that the defendant was denied an opportunity for the hearing required . . ."

In the instant case, without stating the reasons, the court denied the motion. Whether the statements were considered to be admissions or confessions, upon request the trial court is required to allow a hearing to determine whether or not the statements were voluntary or involuntary. When the statements were offered on the trial of the case an objection was made on the ground that they were not voluntary and that they were induced by the office of the State's Attorney. In response to a question of the court counsel for the defendant stated that no written motion to suppress had been filed. The motion of the defendant was opposed by the State on the ground that no motion had been submitted in writing prior to the trial and that the State did not consider the writings to be confessions but that they were in the nature of admissions and therefore not subject to any such motion to suppress.

 Under the decisions we have cited, it is apparent that the trial court erred and that there should have been a hearing on whether or not the statements— either admissions or confessions—were voluntarily given by the defendant. As we have stated, we find that on the evidence in the record before us the defendant was proved

guilty beyond a reasonable doubt. We also find that the court should have conducted a hearing on the defendant's motion to determine whether or not the statements made by him before the trial were voluntary or involuntary. This case is therefore remanded with directions to the trial court to vacate the judgment of conviction and conduct a hearing in accordance with this opinion.

If the court finds that the statements of the defendant were made involuntarily the trial court shall grant the defendant a new trial. If the court finds that the statements were made voluntarily by the defendant the court shall enter a new judgment and sentence in accordance with the verdict of the jury.

Remanded with directions.

ENGLISH, P. J., and DRUCKER, J., concur.