THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DARRELL CANNON, Defendant-Appellant.

(No. 57502;

First District (5th Division)—January 24, 1975.

W. Mauldin Smith, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and Frank J. Parkerson, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DRUCKER delivered the opinion of the court:

On February 6, 1970, at approximately 2:30 P.M., Emanuel Lazar was shot and killed in his toy store located at 1708-10 East 79th Street in Chicago. Five days later defendant was arrested and charged with murder. He was tried before a jury, convicted and sentenced to a term of from 100 to 200 years. Six contentions are raised on appeal: (1) The search of defendant's home which resulted in recovery of the murder weapon was unlawful, and therefore the gun should have been sup-

pressed as evidence; (2) the court improperly admitted into evidence an inflammatory photograph that had no probative value; (3) it was error to allow an assistant State's attorney who had testified at the suppression hearing to serve as a prosecutor at trial; (4) the State's opening and closing arguments were improper; (5) the jury was improperly instructed; and (6) defendant's sentence is excessive. The sufficiency of the evidence to prove defendant guilty beyond a reasonable doubt is not challenged.

Prior to trial defendant moved to suppress as evidence two guns and a wristwatch seized by police, and a hearing was held on this motion. These items were found in the apartment of defendant's grandmother where he was living. It is undisputed that the police did not have a warrant to search the apartment.

Defendant testified that prior to his arrest he resided at 6157 South Kenwood with his grandmother. On February 11, 1970, at approximately 9:30 A.M., he was awakened by Officer Herbie Wells and Assistant State's Attorney James Meltreger. He knew both Wells and Meltreger. They placed him under arrest and drove him to the Criminal Court Building. They told him that he had been implicated in the murder of a shopkeeper in South Shore. They did not advise him of his rights. Upon arriving at the Criminal Court Building he was taken to a second-floor office and questioned. There were perhaps five assistant State's attorneys in the office. He was not allowed to make a telephone call. At no time did he give anyone permission to search the apartment.

*Mrs. Mattie Robinson,* defendant's grandmother, testified on his behalf that he had been living in her apartment. On the morning of February 11, 1970, two men in civilian dress knocked on her door, and when she answered, entered her apartment without her permission. They awakened defendant and then left with him. She did not know that he was under arrest. She knew that one of the men was Herbie Wells but did not know that he was a police officer. At approximately 11 A.M. Wells returned to her apartment. After inquiring about her health he entered the apartment and, without her permission, searched the premises. He took a wristwatch off the dresser in defendant's room and then came back to the living room, reached under the sofa and retrieved two guns.

*James Meltreger* testified for the State that he is an assistant State's attorney assigned to the special prosecutions unit which deals with the criminal activities of street gangs. He was present at the arrest of defendant on February 11, 1970. From his work in the State's attorney's office he had met defendant and knew that he was an informer. He was told by homicide detectives that defendant had been identified as the man who shot and killed a store owner on 79th Street. They told him that a

broken watch crystal had been found at the scene of the crime. He informed Officer Wells of what the detectives had related to him. He accompanied Wells when the officer went to arrest defendant. He wanted to be present so that defendant would be afforded all of his constitutional rights. Mrs. Robinson voluntarily admitted them into her apartment. They went to defendant's bedroom and told him that they were taking him to 26th Street to be interviewed by homicide detectives. He advised defendant of his rights. While in defendant's bedroom he saw a watch with a broken crystal lying on the dresser. Wells put it in his pocket. After they arrived at the Criminal Court Building, defendant asked to speak with Wells alone. After Wells and defendant spoke, the officer went to Mrs. Robinson's apartment and returned with two pistols. He learned that defendant told Wells that the guns belonged to Lawrence Cain.

*Officer Herbie Wells* testified for the State that he was assigned to the Chicago Police Department's gang intelligence unit. He had known defendant for over a year prior to his arrest and had used him as an informer. He had often met with defendant at Mrs. Robinson's apartment, and she knew him to be a police officer. On February 11, 1970, he and Meltreger went to the apartment and informed defendant that he had been identified as the man who killed the owner of a toy store. While defendant was getting dressed, he noticed a watch with a broken crystal lying on the dresser. He had read the homicide unit's report of the shooting and knew that a watch with a broken crystal had been found at the scene of the crime. Defendant stated that the watch belonged to him. After notifying defendant, he put the watch in his pocket. After they arrived at the Criminal Court Building, defendant indicated that he wished to speak with him privately. Defendant told him that he wanted to call his grandmother to tell her to get rid of "some stuff." Defendant then revealed that he wanted to get rid of two guns that had been given to him by Lawrence Cain. Defendant was fearful that due to a similarity in appearance between Cain and himself, he would be blamed for the shooting. He asked defendant for permission to go to the apartment to recover the guns. He explained that a lineup would be held and that if Cain was identified, the guns and defendant's testimony would be used against Cain at trial. Defendant gave him permission to go to the apartment to obtain the guns. Mrs. Robinson admitted him to the apartment. After briefly inquiring about her health, he told her the purpose of his visit. She replied that she had told defendant not to bring the guns into the apartment because he might get into trouble. She said that she did not want them in her home and then went into the living room, reached under the couch and pulled out two guns. She gave them to him, and at

his request gave him a paper bag in which to carry them. The guns were a .357 magnum and a .38-caliber Smith and Wesson.

Counsel argued that neither defendant nor his grandmother consented to a search of the apartment and that consequently, since the police had no warrant, the guns and the watch should be suppressed as evidence. The court found that a long-standing policeman-informer relationship existed between Wells and defendant, that defendant told Wells that he had been given the guns by Cain, that defendant's information had apparently been reliable in the past, and that acting on this information and in an attempt to aid a useful informer, Wells returned to the apartment to retrieve the guns with defendant's permission. The motion to suppress was denied.

At trial *Belle Lazar*, wife of the victim, testified for the State that she and her husband owned the Wee Folks Toy Store located at 1708-10 East 79th Street in Chicago. On February 6, 1970, at approximately 2 or 2:30 P.M., she was working in the front of the store when she saw defendant enter. He was wearing dark trousers and a light jacket; his head was covered. Mr. Lazar was working at the rear of the store. Defendant said that he wanted something for an 8-month old boy. She led him to the westernmost aisle in the store and demonstrated some toys. Defendant asked if he could look around some more, and she returned to the front of the store. She became apprehensive and pushed the holdup alarm located behind the front counter. Defendant started walking toward her; she heard her husband coming from the back of the store. Defendant reached into his pocket, produced a gun and turned around. He said, "Don't move or I'll shoot." As he was speaking, he fired five shots. She pushed the holdup alarm again and crouched behind the counter. When she got up she observed defendant stagger out of the store. She went to the aid of her husband and found him lying still on the floor. A woman, Mrs. Domice Daigre, entered the store and attempted to help her. Shortly thereafter the police and an ambulance arrived. The body of her husband was removed; when she next saw him, at the Jackson Park Hospital, he was dead. Defendant was in the store for 10 to 15 minutes. At no time was she more than 20 feet from him. The store was well illuminated by fluorescent lights. The police showed her a number of photographs, and she identified one of defendant. She also identified defendant at a lineup.

*Chicago Police Officer Roderick Height* testified for the State that on February 6, 1970, at approximately 2:30 P.M., he was in his car directly across the street from the Wee Folks Toy Store when he saw a man back out of the shop and drop to the pavement. The man got up, looked up and down the street, then ran to a black Cadillac parked in a vacant lot

beside the store. After the man got into the car, it sped away. A man in a bus driver's uniform told him that there had been a shooting in the toy store, and they ran to his car and attempted to pursue the Cadillac. However, it eluded them. He described the man he chased as being a Negro, under 25 years of age, 6 feet tall, slender build, dark complexion and wearing a light-beige waist-length jacket and dark trousers. He could not positively identify defendant as this man.

*Chicago Police Officer Ronald Mohrs* testified for the State that on February 6, 1970, he answered a call to go to the Wee Folks Toy Store. When he arrived, he saw Mr. Lazar lying on the floor with five bullet wounds. Witnesses gave him descriptions of the assailant; Mrs. Lazar and Mrs. Daigre said that they could identify him.

*Mrs. Domice Daigre* testified for the State that on February 6, 1970, at approximately 2:30 P.M., she was standing outside the Wee Folks Toy Store looking at the display window. She heard several gun shots being fired and saw a young man scramble over a display rack and try to run out of the store. She backed away and went to her car in the parking lot. The young man proceeded past her, straightening his clothes and putting something in his pocket. He passed within 6 feet of her. She identified him as defendant. She then returned to the store where she reported her observations to police officers. She later identified defendant at a lineup.

*Chicago Police Officer Herbie Wells* testified for the State substantially as he had at the suppression hearing.

*Sergeant Francis Lee* of the Chicago Police Department testified for the State that he accompanied defendant to the lockup following his appearance in a lineup on February 11, 1970. Defendant told him, "[T]he old man was coming at me with his hand in his pocket, I thought he had a gun and I shot him."

*John Sadunas* testified for the State that he is a firearms expert employed by the Chicago Police Department. It was his opinion that the bullets which killed Emanuel Lazar had been fired by the .38-caliber Smith and Wesson revolver recovered from defendant's apartment.

*Homicide Investigator Charles Grunhard* testified for the State that he interviewed defendant at the Criminal Court Building on February 11, 1970. Defendant told him that he and Lawrence Cain discussed the possibility of robbing the toy store on the day on which Emanuel Lazar was shot. Defendant was reluctant to participate because the avenues of escape did not seem secure. However, he waited in the car while Cain acted on the plan. Cain told him when he came running back from the store, "Let's get out of here. I had to burn the guy."

*Robert Martin*, a CTA bus driver, testified for the State that on February 6, 1970, at approximately 2:30 P.M. he was waiting at a bus stop

about 80 feet east of the Wee Folks Toy Store when he heard a series of shots and saw a woman run away from the door of the shop. He observed a tall slender black man wearing a light jacket and dark pants run from the store with a gun in his hand. He identified defendant as this man. He joined another man in an unsuccessful pursuit of defendant's black Cadillac. He identified defendant's photograph from a group which police had shown him and later identified defendant at a lineup.

Defendant testified on his own behalf that Officer Wells had asked him to give information concerning Jeff Fort and the "Main 21," the leadership group of a street gang. Wells threatened to "frame" him for the next homicide committed in the area if he did not cooperate. Defendant denied any participation in the attempted robbery of the Wee Folks Toy Store, being in a black Cadillac in the vicinity of the shop on February 6, 1970, shooting Emanuel Lazar or ever carrying a gun.

OPINION

Defendant first contends that the court below erred in refusing to suppress as evidence the two guns recovered by police from his apartment. Although he does not question the court's finding of fact that he gave permission to Officer Wells to search for these weapons, he asserts that his consent to the search was "overlaid with police coercion."

A person may waive his Fourth Amendment rights. (*People v. Nunn*, 55 Ill.2d 344, 304 N.E.2d 81.) The United States Supreme Court has recently held that the issue of whether such a waiver of rights was coerced "is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." (*Schneckloth v. Bustamonte*, 412 U.S. 218, 248-249; see also *People v. DeMorrow*, 59 Ill.2d 352.) The Illinois rule is clearly in accord with these principles—a valid consent may be given even though the defendant was not advised of his Fourth Amendment rights. In each particular case the determination of this factual question (*i.e.*, whether a valid consent has been given) is to be made by the trial court, and a court of review will accept the finding below unless it is clearly unreasonable. *People v. Armstrong*, 41 Ill.2d 390, 243 N.E.2d 825; *People v. Fiorito*, 19 Ill.2d 246, 166 N.E.2d 606.

In the instant case it appears that defendant, in an effort to implicate Lawrence Cain and thus shift suspicion from himself, volunteered information to Officer Wells concerning the whereabouts of the guns. Wells went to defendant's apartment in an effort to aid a valuable informer. The record indicates that defendant's grandmother assisted Wells

in retrieving the guns when he explained to her the purpose of his visit. There is nothing in the record to indicate that defendant, in giving permission to Wells to get the guns, was frightened, confused or submitting to the presence of authority. In fact, quite the opposite was shown. Defendant had a long-standing relationship with Officer Wells and with members of the staff of the State's attorney and thus apparently was familiar with criminal procedure. (See *People v. Donel*, 44 Ill.2d 280, 255 N.E.2d 454.) It is clear from this record that the court below considered every phase of the question of whether defendant's consent was valid, and we fully acquiesce in its decision to deny the motion to suppress.

Defendant next contends that it was error to admit into evidence a photograph depicting him carrying two handguns. He asserts that this photo was inflammatory and had no probative value. In addition, he claims that the State failed to lay a proper foundation for its introduction.

■■ With regard to defendant's contention that the photo was suggestive, we note that his objection to its admission at trial was based exclusively on the ground that an improper foundation had been laid. Consequently we must view as waived his claim concerning the suggestive nature of the photograph since an "objection to evidence based on a specific ground * * * waives all grounds not specified." *People v. Killebrew*, 55 Ill.2d 337, 341-342, 303 N.E.2d 377; *People v. Weatherspoon*, 20 Ill.App.3d 818, 314 N.E.2d 228.

As to the contention that no foundation was laid as to the authenticity of the photo, the record reveals that defendant admitted it was a picture of himself taken at a party. If a defendant admits to the genuineness of a photograph of himself, this fact alone renders its admission into evidence competent. *Litsinger v. United States* (7th Cir. 1930), 44 F.2d 45.

Defendant claims that it was error to allow Assistant State's Attorney Meltreger to testify at the hearing on the motion to suppress and then participate in his prosecution at trial.

■■ A prosecuting attorney is competent to testify in criminal proceedings in which he serves as an advocate, although the practice is not encouraged. (*People v. Gerold*, 265 Ill. 448, 107 N.E. 165; *People v. Knox*, 90 Ill.App.2d 149, 234 N.E.2d 128.) In large part the reluctance of courts to allow such testimony is the danger that a jury would believe a prosecutor to be more credible than an ordinary witness. (See *Robinson v. United States* (8th Cir. 1928), 32 F.2d 505.) In the instant case this danger did not exist. Meltreger did not testify before the jury but rather was called as a witness at the hearing on the suppression motion conducted two weeks before the commencement of trial. At the hearing his testimony dealt with the circumstances surrounding defendant's arrest which he had witnessed. Under these facts we believe that the court

below did not abuse its discretion in allowing Meltreger to participate as a prosecutor in the trial of defendant.

■■ Defendant next argues that certain statements made during both the State's opening and closing arguments were improper. He first complains that during opening argument the State implied that he was a member of the Blackstone Rangers. A review of the record, however, reveals that the only mention of the name of this street gang came in the following statement:

> "* * * and by the way, there is no contention that the Blackstone Rangers have anything to do with this case."

We believe that, contrary to defendant's contention, this statement would tend to absolve him of any connection with the street gang, and therefore he suffered no prejudice.

It is also argued that at the close of trial Assistant State's Attorney Meltreger argued facts not in evidence which were based exclusively upon his personal knowledge. Specifically, defendant points to Meltreger's comments concerning the circumstances surrounding his arrest. We agree that it was improper for Meltreger to cast his narrative describing these events in the first person, but in view of the fact that these comments were consistent with the accounts of defendant's arrest given by Detective Grunhard and Officer Wells, we believe this error to be harmless beyond a reasonable doubt.

Defendant asserts that the jury was improperly instructed. He argues that since he presented a defense solely to a charge of felony murder, he was prejudiced by the giving of murder instructions based on theories other than felony murder. We find no merit in this contention. Defendant was charged in the indictment under all three sections of the murder provision of our Criminal Code. (Ill. Rev. Stat. 1971, ch. 38, par. 9—1(a).)* The State introduced evidence tending to prove the commission of the offense under any of these three theories. The court instructed the jury pursuant to IPI—Criminal Nos. 7.01, 7.02, which present all of the elements of murder. Under these circumstances it clearly "was not error

---

* Section 9—1(a) of the Criminal Code (Ill. Rev. Stat. 1971, ch. 38, par. 9—1 (a)) provides:

> "(a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:
>
> (1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or
>
> (2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another; or
>
> (3) He is attempting or committing a forcible felony other than voluntary manslaughter."

to instruct the jury as to elements of the crime as defined by statute, nor to tell the jury the charge set forth in the indictment." *People v. Cesarz*, 44 Ill.2d 180, 190, 255 N.E.2d 1.

■■ Defendant also argues that the court was obligated to give the following instruction:

> "The Court instructs the jury if there are two theories which may lawfully be drawn from the evidence, one pointing to guilt and the other to absence of guilt, they should find the defendant not guilty."

In *People v. Rhodes*, 41 Ill.2d 494, 499, 244 N.E.2d 145, where the identical instruction was tendered, the supreme court in holding that it had been properly refused stated:

> "Such an instruction is proper only when the opposing theories arise out of the same facts. Where the defense is that the defendant did not participate in the alleged crime, it is proper to refuse such an instruction."

In view of the fact that in the instant case, contrary to his assertion, defendant relied simply upon the defense that he was not the person who shot Emanuel Lazar and that in fact police officers wanted to "frame" him for the crime, we believe that *Rhodes* controls our disposition of defendant's contention.

■■ Finally, defendant contends that his sentence is excessive. We note that he was convicted of ruthlessly shooting down the elderly owner of a toy shop. The record reveals that at the hearing in aggravation and mitigation defendant, when given the opportunity to speak on his own behalf, manifested absolutely no remorse for his actions. The trial court, which of course had the opportunity to study the conduct and demeanor of defendant throughout the trial and sentencing hearing, carefully weighed his potential for rehabilitation against such factors as the nature of the crime and his character and history. In light of this record we believe that the imposition of a sentence of from 100 to 200 years was neither violative of statute (see Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1) nor an abuse of the trial court's discretion, and consequently we hold that it should remain undisturbed.

For the foregoing reasons the judgment is affirmed.

Affirmed.

LORENZ and SULLIVAN, JJ., concur.