THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TROY JANES, Defendant-Appellant.

Second District   No. 83—0777

Opinion filed November 21, 1985.

G. Joseph Weller and Marguerite S. Klimkowski, both of State Appellate Defender's Office, of Elgin, for appellant.

Robert J. Morrow, State's Attorney, of Geneva (Phyllis J. Perko, of State's Attorneys Appellate Service Commission, of Elgin, and Raymond L. Beck, of State's Attorneys Appellate Service Commission, of Ottawa, of counsel), for the People.

JUSTICE STROUSE delivered the opinion of the court:

The defendant, Troy Janes, appeals from his conviction of armed robbery and aggravated battery, raising three assignments of error: (1) his constitutional right to confront witnesses was violated when the nontestifying codefendant's inculpatory hearsay statement was admitted into evidence, (2) the trial court erred in admitting evidence of defendant's arrest for an unrelated theft offense, and (3) he was denied a fair trial when the prosecutor was permitted to testify as a rebuttal witness and to use his testimony in his closing argument.

The defendant was charged by indictment with the offenses of armed robbery (Ill. Rev. Stat. 1983, ch. 38, par. 18—2) and aggravated battery (Ill. Rev. Stat. 1983, ch. 38, pars. 12—3, 12—4). Codefendant Tom Potochney was charged with armed robbery and aggravated battery in a separate indictment.

At trial, the victim, Michael Brown, testified that on the evening of January 29, 1983, he was working as a bartender at a local pub. After work early on January 30, he remained at the pub and drank a

few beers. On his way home, his car broke down on Jericho Road. He walked to a corner telephone to call his fiancee, who was inside the apartment. On his way to the telephone, a car came near Brown; two men exited the car and began fighting with Brown after an exchange of language. Brown was hit in the back of the head with something, and someone said something to Brown about his wallet. His injuries resulted in hospital treatment and four or five days' bedrest at home. He identified the defendant and his own wallet at trial. He testified he had the wallet in his possession on the night of the incident but, because he was so disoriented, he was not aware his wallet was missing until that afternoon, when the police brought it to his apartment to be identified. Brown further testified he never saw defendant holding anything in his hands. In the course of talking with the authorities, Brown learned that his wallet was missing.

Brown also testified he selected defendant out of a five-man lineup on February 1, 1983. In regard to whether he was told to identify anyone, he responded, "They didn't say I had to." He was impeached with his testimony at the pretrial motion hearing where he was asked whether he recalled anyone stating to him that he was to pick out one of the five people, to which he responded "yes." Further, he testified that, prior to the lineup, he was told "both of them" would be present in the lineup.

Aurora police officer Joseph Stratman testified that on January 30, 1983, at approximately 4 a.m. he responded to a call at Hollyridge Apartments. He found Michael Brown near the rear exit of the apartment building leaning over with blood dripping from his head. Stratman attempted to converse with Brown, but was unable to find out what had occurred because Brown was mumbling.

James Sheldon, a Montgomery fire department paramedic, testified that he had administered medical assistance to Michael Brown at 5 a.m. that morning. In his written report, he indicated that Brown was conscious, oriented and cooperative, and that Brown stated his injuries were the result of an accident, while he testified that Brown was very close to being incoherent, disoriented, and unconscious.

Aurora police officer Douglas Needham testified that on January 30, 1983, he received information that three suspects had a stolen snowblower in their possession and he went to investigate. Officer Needham testified that he booked the defendant and then found a wallet on him which was later identified as Brown's. Defendant had said the wallet belonged to himself. Officer Needham testified that at the time he booked defendant, he was not aware defendant had been involved in an armed robbery.

Detective Robert Cannon of the Kane County sheriff's department testified that on February 1, 1983, he and Detective Atchison executed a search warrant on codefendant Thomas Potochney's vehicle and found a tire iron lug wrench on the floor near the front passenger seat.

John Marszalek, a Kane County sheriff's deputy, testified to oral statements allegedly made by defendant on January 31 which placed defendant and codefendant at the scene of the crime and inculpated codefendant as the person who beat the victim with a tire iron and took the victim's wallet. Deputy Marszalek observed codefendant at the Kane County Correctional Complex and noticed that his right hand was swollen.

On redirect examination, the prosecutor asked Deputy Marszalek if codefendant had told him what defendant did with the tire iron that came from the car. Defense counsel objected on the basis that such a statement was hearsay. The court sustained the objection and suggested that the codefendant should be called as a witness if his testimony was so critical to the State's case. The court then granted the State's request to ask Deputy Marszalek when he learned that codefendant had exited the car with the tire iron.

When the trial resumed, the prosecutor asked Marszalek the above question, to which he responded that codefendant stated he had left the car with the tire iron. Marszalek stated the defendant never told him that he left the car with the tire iron, but that he learned from codefendant that the defendant left the car with the tire iron. The State then rested its case.

Judith Brawka, an assistant public defender who had originally represented defendant, testified for the defense regarding the February 1 lineup. She testified she was present in the viewing room with Assistant State's Attorney J. Brick VanDerSnick, Brown, and Detective Atchison. In observing Brown during the lineup, she noticed no physical reaction by him to suggest recognition of any of the five participants. Brown did not identify anyone in the lineup at that time, and he declined to circle any of the numbers on the piece of paper given to him by VanDerSnick. Brawka asked VanDerSnick if she could be present when Brown talked about the lineup or made his identification, and he agreed. Upon leaving the viewing room, Brown, VanDerSnick and one of the deputies went into another room. As Brawka arrived at this room a few minutes later, VanDerSnick informed her that Brown had identified Troy Janes. VanDerSnick agreed Brawka was not present when Brown made the identification.

Deputy Rick McKiness of the Kane County sheriff's department

questioned Michael Brown on the day of the offense, and he stated that a vehicle pulled up to him, two or three subjects exited the vehicle, and they beat him and stole his wallet. Brown was unable to provide Deputy McKiness with any description of the offenders or the vehicle involved. During questioning, Brown was having trouble speaking due to the swelling around his face, and McKiness left Brown's apartment because Brown was in pain and was not able to provide further information.

Sergeant David Wagner of the Kane County sheriff's department testified that he responded to the investigation on January 30. He testified that Brown was not cooperative with the investigating authorities and that an Aurora police officer had relayed to him Brown's statement that he "was in a fight over a girlfriend or something" and that Brown had said his wallet was not taken. Wagner never talked to Brown, and he did not have any personal knowledge of what Brown had said.

On the second day of trial, Assistant State's Attorney VanDerSnick asked to testify as a rebuttal witness because he felt an inference had been raised as to his integrity. Over defense counsel's objection, the trial court granted the State's request.

When the trial resumed, VanDerSnick was sworn and testified to the lineup he conducted. He testified, in response to questioning by another assistant State's Attorney, that he explained to Brown that two suspects had been charged in the case, that they might or might not be in the lineup, and that after viewing the lineup they would go outside and talk about it. In fact, Brown had been told that after the lineup he was to talk to VanDerSnick and the interviewing officer. VanDerSnick admitted they did not go outside and talk about the lineup. Immediately after the lineup he, Brown and Detective Atchison left the viewing room and went into another room down the hallway and around the corner. While Brawka was on her way, but before she arrived, Brown identified defendant, who was in the No. 1 position in the lineup.

Following closing arguments by VanDerSnick, which referred at length to his personal integrity and especially the propriety of his conduct at the time of the lineup, the jury found defendant guilty of one count of armed robbery, one county of battery, and two counts of aggravated battery.

At the August 9, 1983, hearing, the State conceded that the convictions for battery and for aggravated battery based on great bodily harm should be vacated. The court sentenced defendant to concurrent prison terms of 10 years for armed robbery and five years for the re-

maining aggravated battery.

On August 11, 1983, on the court's own motion, a hearing was conducted to reconsider the sentence. At the hearing, the trial judge expressed concern over the "huge disparity" between the outcome of defendant's and codefendant's cases, since the codefendant was only convicted of a misdemeanor. Accordingly, to achieve some measure of fairness, the judge reduced the armed robbery sentence from 10 years to six years in the Illinois Department of Corrections. Defendant appealed.

■ Defendant first contends his right to confront witnesses was violated when the trial court admitted into evidence an inculpatory statement made by codefendant Tom Potochney, who did not testify at trial.

A careful review of the record is necessary in determining whether codefendant's statement violated defendant's constitutional right to confront witnesses. On cross-examination, Deputy Marszalek said he learned that the codefendant exited the car with the tire iron. On redirect, he was asked what the defendant did with the tire iron. An objection was sustained and the court suggested that the State call the codefendant as a witness. The State then elicited that the codefendant had said the defendant left the car with the tire iron. Although the original objection had been sustained, the prosecutor persisted, and the jury learned that the codefendant stated the defendant left the car with the tire iron, although the codefendant was never called to the witness stand.

Defendant submits that the State's line of questioning was in disregard of the court's in-chambers ruling and, further, in violation of his sixth amendment right to confront witnesses testifying against him. It is clear that the line of questioning was in direct violation of the court's ruling and was, therefore, improper.

Defendant argues that codefendant's statement was the only evidence directly linking defendant with the tire iron allegedly used in the armed robbery, and, therefore, its admission constituted reversible error. The State argues that if it was error, it was harmless.

The evidence introduced at trial establishing defendant's guilt includes the following: The complaining witness, Michael Brown, identified defendant both at trial and in a lineup as one of the two men who fought with him on the morning in question. Brown's wallet was found on defendant when he was arrested on an unrelated theft offense. Deputy Marszalek testified to defendant's statements that he was with codefendant Potochney at the scene of the crime, but that Potochney was the one who beat Brown with a tire iron and took his

wallet; defendant himself kept the wallet. Moreover, defendant initially had told Marszalek that he was at a party in Aurora on the night in question, at midnight he witnessed Brown fighting with some other individuals, and after Brown left the premises defendant found Brown's wallet on the floor and he kept it. Such false exculpatory statements may be indicative of defendant's consciousness of guilt. *Cf. People v. Watson* (1982), 103 Ill. App. 3d 992, 995.

Furthermore, Potochney made two statements, one of which stated he left with the tire iron and one that the defendant did. That factor is not critical since the jury was given an accountability instruction. Thus, regardless of who actually carried the tire iron from the car, defendant could be held legally responsible for the commission of the offense. (See *People v. Schlig* (1983), 120 Ill. App. 3d 561, 570.) We hold that, while it was error for the State to pursue a line of questioning prohibited by the trial judge, it does not justify setting aside this verdict.

■■■ The next issue is whether the trial court erred in admitting evidence of defendant's arrest for an unrelated theft offense. Defendant submits that admission of such evidence constituted reversible error.

The evidence in question consists of Officer Needham's trial testimony that on January 30, 1983, he had received information that suspects had a stolen snowblower in their possession and he went to investigate the matter. Defense counsel objected and, in a side bar discussion, informed the court that a motion *in limine* had been filed as to this incident. The prosecutor responded that he would ask the witness only about the booking, and the court denied defense counsel's request to instruct the jury to disregard the testimony about the stolen snowblower. When direct examination was resumed, Officer Needham testified that he had booked the defendant. During the booking process, Needham found a wallet in defendant's pocket which defendant first said was his own, but which was later identified as belonging to Michael Brown. On redirect examination, the prosecutor asked, without objection, "Detective [*sic*] Needham, at the time you booked Troy Janes, were you aware that he had been charged or involved in an armed robbery?" Needham replied in the negative.

While the State claims that this issue is waived, we address the question. Generally, evidence of other crimes is not admissible unless it tends to prove a fact in issue or to show motive, intent, identity, absence of mistake or *modus operandi.* (*People v. Clark* (1984), 124 Ill. App. 3d 14, 22.) In fact, this court has held that evidence of other offenses is admissible if it is relevant for any purpose other than to

show the propensity to commit crime. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 182.) In *McKibbins,* the defendant was arrested for robbery while he was in the course of another offense; the court stated it would be difficult to explain the defendant's arrest without some showing of the circumstances surrounding his arrest. (96 Ill. 2d 176, 183.) Here, the defendant in fact was arrested for stealing a snowblower and, while he was being booked, a wallet was found belonging to the victim which the defendant initially claimed as his own. At that time, the detectives and the victim himself were unaware that the wallet had been stolen. We conclude this limited evidence of another crime for purposes of showing his arrest and booking is clearly admissible.

Defendant finally contends that he was deprived of a fair trial when the prosecutor was permitted to testify at trial and to use his own testimony in a highly prejudicial closing argument.

At trial, both prosecution and defense witnesses testified to the lineup identification. Then, during an in-chambers conference on the last day of the trial, Assistant State's Attorney VanDerSnick indicated it was imperative that he testify, because his personal and professional integrity had been challenged. Defense attorney Van Larson explained that this was not a personal attack on VanDerSnick, but that defense counsel had a responsibility to his client to argue any reasonable inferences arising out of the lineup circumstances. The court permitted VanDerSnick to testify when the jury trial resumed.

VanDerSnick testified that he had organized the lineup where defendant was placed in the No. 1 position. VanDerSnick testified that assistant public defender Judith Brawka, Kane County sheriff's detective Thomas Atchison, and the complaining witness, Michael Brown, were present in the viewing room when he told Brown that two defendants who had been charged may or may not be in the lineups, and that they would go outside and talk about the lineup after viewing.

On cross-examination, Larson also questioned VanDerSnick regarding a lineup witness instruction sheet which was read to Brown before the lineup. This sheet directs a witness to speak only to the interviewing officer about any lineup identification. VanDerSnick agreed that the unsigned space for the interviewing officer did not inform Brown whom he was to speak with after the lineup. On redirect, over defense counsel's objection, VanDerSnick testified that he orally told Brown to whom he should speak. The prosecutor stated he told Brawka that Brown identified the person in the No. 1 position.

These same conflicts of testimony about the lineup had surfaced

at the suppression hearing two months earlier when it became necessary for both VanDerSnick and Brawka to testify.

The issue is whether reversible error was committed by Assistant State's Attorney VanDerSnick when he testified as a rebuttal witness in a trial which he was prosecuting and then used his own testimony extensively in his closing argument.

As stated by the Court of Appeals for the Seventh Circuit in *United States v. Johnston* (7th Cir. 1982), 690 F.2d 638, 642:

> "The advocate-witness rule, which articulates the professional impropriety of assuming the dual role of advocate and witness in a single proceeding, has deep roots in American law. Today, the rule is reflected in the ABA Code of Professional Responsibility which states as an 'ethical consideration':
>
>> 'The roles of an advocate and of the witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of the witness is to state facts objectively.'
>
> The Code's Disciplinary Rules have codified this ethical consideration. The rules prohibit an attorney from accepting employment in contemplated or pending litigation when it is obvious that he will be called as a witness. If the need for his testimony becomes apparent after the attorney has undertaken employment in the case he must withdraw from the conduct of the trial."

The *Johnston* court further set forth four principal policies served by the advocate witness rule which we find persuasive. First, the rule eliminates the risk that a testifying prosecutor will not be a fully objective witness given his position as a government advocate. Second, there is fear that the prestige or prominence of a prosecutor's office will artificially enhance his credibility as a witness. Third, the performance of dual roles by a prosecutor might create confusion on the part of the trier of fact as to whether the prosecutor is speaking in the capacity of an advocate or of a witness. Fourth, the rule reflects a broader concern for public confidence in the administration of justice and implements the maxim that "justice must satisfy the appearance of justice." *United States v. Johnston* (7th Cir. 1982), 690 F.2d 638, 643.

Although the practice is not encouraged and is subject to limitations, the traditional rule in Illinois is that a prosecuting attorney may testify in a criminal case in which he is engaged if, in the discretion of the trial court, such testimony is necessary. (*People v. Langdon* (1980), 91 Ill. App. 3d 1050, 1056; see *People v. Cannon*

(1975), 25 Ill. App. 3d 737, 744.) A court of review will not overturn that determination absent an abuse of discretion. (*People v. Langdon* (1980), 91 Ill. App. 3d 1050, 1056.) The reluctance of the courts to permit the prosecutor to testify reflects the belief that the jury will accord far greater weight to his testimony than to that of an ordinary witness, by virtue of the prosecutor's personal prestige and official status. *People v. Langdon* (1980), 91 Ill. app. 3d 1050, 1056; see *People v. Gendron* (1968), 41 Ill. 2d 351, 358.

In *People v. Langdon* (1980), 91 Ill. App. 3d 1050, the prosecutor was permitted to testify as a rebuttal witness while continuing to prosecute the case. He had spoken to a defense witness during the trial, and that witness could not remember anything about the robbery and could not identify anyone. The witness had then testified at trial that he remembered the robbery, but that defendant was not one of the offenders. The trial court also overruled an objection to the prosecutor giving closing argument, but it did direct him not to make any argument concerning any of the facts to which he had testified. (91 Ill. App. 3d 1050, 1053.) On appeal, this court held that the trial court acted within its discretion in finding that the prosecutor's testimony was material and necessary, and properly admitted as impeachment. This court, however, concluded that the prosecutor should have withdrawn from the case in order to present his testimony. Nevertheless, the error did not justify reversal since defendant failed to demonstrate that he was prejudiced by the testimony and participation in closing arguments. 91 Ill. App. 3d 1050, 1056-57.

Similarly, in *People v. Jackson* (1982), 105 Ill. App. 3d 750, the assistant State's Attorney who was prosecuting the case was questioned by another assistant State's Attorney. His testimony impeached a hostile rebuttal witness by certain prior inconsistent statements made to the prosecutor. The trial court granted defendant's request to limit the effect of the prosecutor's testimony. This court held that the prosecutor's testimony was necessary and was properly limited. 105 Ill. App. 3d 750, 756.

There are substantial and relevant distinctions between both *Langdon* and *Jackson* and the case at bar. In those cases, the impeached witnesses had previously made statements in support of the State's case and yet, at trial, testified to the contrary; there was an element of surprise in both witnesses' trial testimony; the prosecutor was the only one who could testify to the matters in issue. In the instant case, there is no surprise, as all the witnesses testified as they had at the earlier suppression hearing. Moreover, Detective Atchison and the victim could have testified to the lineup and identification pro-

cedure since they were present throughout. Atchison had been listed as a State's witness at trial and, in fact, he had testified at the suppression hearing. Since the State could foresee the possibility of VanDerSnick having to testify at trial, he should have withdrawn from the case as did the assistant public defender. Under the circumstances VanDerSnick's testimony was clearly erroneous.

■ We must then determine whether the defendant was prejudiced by VanDerSnick's closing argument. (See *People v. Langdon* (1980), 91 Ill. App. 3d 1050, 1057.) In his closing argument, VanDerSnick commented on his testimony as follows:

"It has been a little unusual in this case that Ms. Brawka has had to testify and myself testify. Believe me, it does not happen. It is the first time it happened in five years. I hope it will never happen again. Please don't look down in disfavor in determining what I had to say like anybody else."

He then described the lineup procedure and referred to Judith Brawka's testimony about the piece of paper marked with numbers 1 through 5 which VanDerSnick gave to the complaining witness.

"Perhaps the State's Attorney in this case should have kept the paper, foreseeing what counsel considers to be a very big problem. But me, I don't consider it a big problem because Ms. Brawka stated there was a piece of paper, 1, 2, 3, 4, 5 and it was thrown away. She tells you that she walked approximately forty-five feet. And she was asked by the Assistant State's Attorney, would you like to come along? She was invited, ladies and gentlemen. You heard the testimony. She collected her books. She could have very well been left there. But the assistant, being myself, Michael Brown and Detective Atchison, we went around the corner. It is very important, ladies and gentlemen, there were no improprieties in this case at all, nothing."

In VanDerSnick's rebuttal argument, he emphasized his integrity and his job as follows:

"My job in this case, ladies and gentlemen, as prosecutor and under the ethics and standards of the American Bar Association are two-fold: No. 1, and the very most important one which I am proud of, is to administer justice. I am not up here on my soapbox, but I am to tell you this. My job is to make sure that that defendant, throughout the proceedings from the time he is arrested until the end of the trial, see that he gets a fair trial. It is not my job to railroad the defendant or to set up the defendant. In this case there is an intimation of that. It has not been done, ladies and gentlemen, I submit that to you. The

proof is just the opposite.

*** I have my integrity and I also have a job to do. There are many defendants out on the street. I don't need to set up Mr. Troy Janes to get him. It is not necessary, ladies and gentlemen, there is [sic] enough other defendants out there. If that bothers you, if you feel that the State's Attorney's office in this case perhaps has done something wrong, *I submit to you that it is unfortunate that I had to take the stand to show you that there was nothing wrong with what we have done.* We did not tell the defendant—did not tell Mr. Brown that Troy Janes was in the lineup." (Emphasis added.)

He then responded to defense counsel's suggestion that the lineup was improper by stating:

"You heard the testimony that Michael Brown and Atchison went down the hallway with the Assistant, being myself, following, and Michael Brown said that number 1 is the man. That's it. No contradiction. And he did not say that Mr. Van Der Snick said to Michael Brown, Mike, it is number 1, isn't it? No, that is not what happened and that Detective Atchison said to Mike, it is number 1? No, that is not what happened.

That, ladies and gentlemen, is uncontradicted from that stand. There was nothing done improper in that lineup."

VanDerSnick then questioned defense counsel's motives, suggesting that he was attempting to try the victim, the police and the prosecutor.

"If you have a defendant and you know, based on the evidence, that he is guilty, what do you do, and it has been done in this case? You try the police, you try the victim and lo and behold you try the prosecutor. That is what happened. And that is my job, and I can handle it. But don't let him mislead you to believe that because everybody else is being attacked, Mr. Janes is not guilty based on the evidence. That is what he wants you to do."

Prosecutors are allowed wide latitude in closing argument, and improper remarks will not merit reversal unless they result in substantial prejudice to defendant, considering the content of the language used, its relationship to the evidence, and its effect on defendant's right to a fair and impartial trial. (*People v. Ray* (1984), 126 Ill. App. 3d 656, 663.) Even when defendant's guilt has been strongly established by eyewitness testimony, reversal may be warranted. See *People v. Ray* (1984), 126 Ill. App. 3d 656, 663, and cases cited therein.

In effect, the prosecutor here put on trial his reputation and integrity against the guilt of the defendant and the conduct of the defense attorney. In light of the numerous instances of misconduct which occurred throughout the trial, it is unnecessary to assess the prejudicial effect of each isolated comment. We have thoroughly reviewed the entire record and we conclude that the cumulative impact of the prosecutor's statements could well have prejudiced the jury and constituted a material factor leading to defendant's conviction, thereby depriving him of a fair trial. (See *People v. Starks* (1983), 116 Ill. App. 3d 384, 395-96.) Under these circumstances, the defendant is entitled to a new trial.

The judgment of the circuit court is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

NASH, P.J., and HOPF, J., concur.